**E-FILED**
Tuesday, 17 March, 2015  03:18:20 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

PEORIA DIVISION

| | | |
|---|---|---|
| ROBERT LOWINGER and ISSEK FUCHS, Derivatively on Behalf of CATERPILLAR INC., | ) ) ) | Case No. 15-cv-01109 |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | |
| v. | ) ) | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| DOUGLAS R. OBERHELMAN, EDWARD J. RAPP, STEVEN H. WUNNING, and LUIS De LEON, | ) ) ) ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants, | ) ) | |
| -and- | ) ) | |
| CATERPILLAR INC., a Delaware Corporation, | ) ) ) | |
| | ) | |
| Nominal Defendant. | ) ) | |

Plaintiffs Robert Lowinger and Issek Fuchs (collectively referred to herein as "Plaintiffs") allege derivatively on behalf of Caterpillar Inc. ("Caterpillar" or the "Company"), by and through their undersigned attorneys, upon knowledge as to themselves and their own acts, and upon information and belief as to all other matters based upon the investigation of their attorneys, which included, but was not limited to, a review of Securities and Exchange Commission ("SEC") filings, news reports, press releases, securities analyst reports and other publicly available information regarding the Company and the underlying claims asserted in this Complaint, as follows:

## NATURE OF THE ACTION

1.      In or about June 2012, Defendants caused Caterpillar to pay approximately $677 million to acquire (the "Acquisition") ERA Mining Machinery Limited ("ERA Mining") and its wholly owned subsidiary Xhengzhou Siwei Mechanical & Electrical Manufacturing Co., Ltd. ("Siwei").  In doing so, Defendants knowingly or recklessly disregarded serious accounting issues plaguing Siwei and calling into question the value of the Acquisition.  In or about January 2013, a few short months after completing the Acquisition, Caterpillar announced that an internal investigation had uncovered an accounting fraud by Siwei senior management causing Caterpillar to recognize a *$580 million* write-down in connection with the Acquisition.

2.      Plaintiffs, who are shareholders of Caterpillar made a demand (the "Demand") on Caterpillar's board of directors (the "Board") to take action against Defendants with respect to the losses suffered by the Company in connection with the Acquisition.  The Board has failed to respond to the Demand and, accordingly, Plaintiffs are bringing this action derivatively on behalf of Caterpillar to hold the Individual Defendants accountable for their breaches of fiduciary duty in connection with the Acquisition.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332, as a result of the parties having complete diversity and the amount in controversy exceeding $75,000, exclusive of interest and costs.  Plaintiffs are citizens of New York.  Nominal defendant Caterpillar is a citizen of Delaware where it is incorporated and Illinois where its principal place of business is located.  The Defendants are all citizens of states other than New York.  This action is not a collusive action designed to confer jurisdiction on the Court that it would not otherwise have.

4.      This Court has jurisdiction over each Defendant because nominal defendant Caterpillar is a corporation that conducts business in and maintains its principal place of business within this District and each of the Individual Defendants has sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

5.      Venue is proper in this District pursuant to 28 U.S.C. §1391.  Nominal defendant Caterpillar maintains its principal place of business in this District.  At least one of the Individual Defendants resides or maintains an office in this District.  Moreover a substantial part of the acts and conducted complained of herein occurred in this District.

## THE PARTIES

**Plaintiffs**

6.      Plaintiff Robert Lowinger is and has been a shareholder of Caterpillar since August 2011.  Plaintiff Lowinger is a citizen of New York.

7.      Plaintiff Issek Fuchs is and has been a shareholder of Caterpillar since July 2009.  Plaintiff Fuchs is a citizen of New York

**Nominal Defendant**

8.      Nominal defendant Caterpillar is a Delaware corporation with its principal place of business located at 100 NE Adams Street, Peoria, Illinois 61629.  Caterpillar is a citizen of Delaware and Illinois.

**Individual Defendants**

9.      Defendant Douglas R. Oberhelman ("Oberhelman") is, and at all relevant times was, Caterpillar's Chairman of the Company's board of directors (the "Board") and Chief Executive Officer.  Defendant Oberhelman is a citizen of Illinois.

10.     Defendant Edward J. Rapp ("Rapp") served as Caterpillar's Chief Financial Officer between June 2010 and December 2012 and has also served as a Group President since 2007.  Defendant Rapp is a citizen of Illinois.

11.     Defendant Steven H. Wunning ("Wunning") was, at all relevant times, a Caterpillar Group President.  Defendant Wunning is a citizen of Illinois.

12.     Defendant Luis de Leon ("de Leon") served as a Caterpillar mining product vice president between June 2011 and January 2013.  Defendant de Leon is a citizen of Wisconsin.

13.     Defendants Oberhelman, Rapp, Wunning and de Leon are, at times, collectively referred to herein as the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

**Caterpillar**

14.     Caterpillar is the world's leading manufacturer of construction and mining equipment, diesel and natural gas engines, industrial gas turbines and diesel-electric locomotives.  The company principally operates through its Machinery and Power Systems businesses through three product segments - Resource Industries, Construction Industries, and Power Systems - and also provides financing and related services through its Financial Products segment.  Caterpillar is also a leading U.S. exporter.

15.     Caterpillar has a long history of operations in China and, during the past three decades, Caterpillar has grown from a single sales office in Beijing to numerous manufacturing facilities, research and development facilities, logistics and parts centers and other offices across China.  In August 2010, defendant Oberhelman outlined his global strategy to investors stating: "We are stepping up big time putting our money where our mouths are.  We're going to play

-4-

offensive, and we're going to win. We will win in China."  As part of Caterpillar's long term strategy, the Company had identified the mining industry as a key imperative in 2011.

**Siwei**

16.    Siwei is a manufacturer of hydraulic mining roof supports based in China and at times relevant to this complaint was a wholly owned subsidiary of ERA Mining.  ERA Mining became publicly listed on the Honk Kong Stock Exchange in 2010.

**Caterpillar Announces its Intention to Proceed With the Acquisition**

17.    The driving force and sponsors of Caterpillar's purchase of Siwei were defendants Rapp and Wunning.  In October 2011, defendants Rapp and Wunning, advocated to Caterpillar's Board the idea of buying Siwei.  As detailed in a January 23, 2013 *Reuters* article entitled "How Caterpillar Got Bulldozed in China," the project was known internally at the Company as "Project Sequoia."

18.    On November 10, 2011, Caterpillar and ERA Mining issued a joint press release announcing Caterpillar's pre-conditional voluntary offer for all the shares of ERA Mining, the corporate parent of Siwei.  The press release provided, in relevant part, that:

> [T]he offer consists of two options: (i) an all-cash alternative to acquire the Shares in consideration for HKD $0.88 cash per Share, and/or (ii) a loan note alternative, which will entitle the loan note holder to receive a minimum of HKD $0.75 and up to HKD $1.15 per loan note upon redemption. ERA shareholders will be able to elect to receive the all-cash alternative in relation to some of their Shares and the loan note alternative in relation to the remainder of their Shares, or to elect to receive either the all-cash alternative or the loan note alternative in relation to all of their Shares. Dependent upon ERA's performance and the number of shareholders who elect the cash alternative or the number who elect the loan note alternative, the offer values ERA at between HKD $4,490 million and HKD $6,885 million [approximately $575 million and $900 million, respectively] on a fully diluted basis.

19.    The Acquisition was contingent on obtaining approval from China's Ministry of Commerce and any other consent required by the Chinese government.

20.     As reported by *The Wall Street Journal* on November 10, 2011, Caterpillar's offer represented a 33% premium over ERA Mining's publicly traded price prior to the announcement of the Acquisition.

**Red Flags Emerge Prior to the Acquisition Being Completed**

21.     On or about November 7, 2011, Defendants became aware that Siwei's customers were not paying their bills in a timely fashion and that Siwei would require an immediate $50 million loan for working capital.  Defendant was also made aware that Siwei had not made required overtime payments to workers and did not hold required Chinese operating permits.

22.     On November 10, 2011, RBC Capital Markets published a research report entitled "[Caterpillar] Reportedly Buying ERA Mining Machinery (Valuation looks rich)" concerning *The Wall Street Journal's* reported 33% premium for the Acquisition, stating that: "[t]he multiple is at the upper end of recent mining machinery transactions, and ***we consider it to be rich*** . . . ." (Emphasis added.)

23.     On or about March 19, 2012, ERA Mining issued a "Profit Warning" stating that the company was "expected to record a substantial decrease in profit or even a loss for the year ended 31 December 2011 as compared with a profit for the year ended 31 December 2010 . . . ." According to a February 12, 2013 article published in the *Financial Times* entitled "Caterpillar Digs Into Trouble in China," Caterpillar flew ERA Mining executives to Peoria to explain the Profit Warning, but decided to push forward with the deal nonetheless.

24.     In March 2012, defendant Wunning presented a memorandum to the Board showing that Siwei has missed its 2011 target and that ERA Mining was going to report a $2 million loss as opposed to a $16 million profit.

25.     In March 2012, Defendant Wunning informed the Board that Siwei's accounts receivables had grown from 320 days (e.g., almost one year) to 371 average days outstanding, also known as days sales outstanding ("DSO").  That DSO metric was in stark contrast to the typical mining company where receivables beyond 90 days are disqualified for being considered as collateral for a loan.  Thus, Siwei's average receivables of over one-year were extraordinary for a mining company and according to literature on accounting statement analysis evidenced either: a poor collection job; difficulty in obtaining prompt payment from customers in spite of diligent collection efforts; customers in financial difficulty; or improperly recorded sales.

26.     On or about March 30, 2012, ERA Mining released its 2011 Annual Report disclosing the alarming trend in trade receivables and also disclosing that ERA Mining's "Allowances for bad and doubtful debts" had increased over 450% from HK\$11,670,000 in 2010 to HK\$53,531,000 in 2011.  Such a large increase in doubtful accounts, especially when coming in combination with a high DSO, called into question the viability of many of the sales made by Siwei.

27.     Chart 1 below, based upon Siwei's publicly available accounting statements, demonstrates the sharp rise in trade receivables with Siwei's increase in accounts receivables growing at an average annual rate of 97% since 2007, finally overtaking the total amount of Siwei's reported sales in 2010.

**CHART 1**
**(Siwei's Sales and Trade Receivables Growth)**

|  | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| **Sales (in HK$ '000)** | 563,531 | 1,008,540 | 1,236,197 | 1,768,913 | 1,953,342 |
| **Sales Growth** |  | 79% | 23% | 43% | 10% |
|  |  |  |  |  |  |
| **Receivables (in HK$ '000)** | 203,811 | 596,934 | 1,094,723 | 1,914,153 | 2,655,252 |
| **Receivables Growth** |  | 193% | 83% | 75% | 39% |
|  |  |  |  |  |  |
| **Receivables/Sales** | 36% | 59% | 89% | 108% | 136% |

28.     Siwei's financial statements additionally revealed that its debt had ballooned since 2007 growing at an average annual rate of 257%, as demonstrated in Chart 2 below.

**CHART 2**
**(Siwei's Debt Growth)**

|  | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| **Borrowings (in HK$ '000)** | 30,851 | 32,954 | 300,549 | 496,442 | 1,205,969 |
| **Borrowings Growth** |  | 7% | 812% | 65% | 143% |

29.     As reported by *Reuters*, Siwei also had issues with respect to unsold goods, with ERA Mining's 2011 Annual Report disclosing that inventory had increased 234% from HK$202,014,000 in 2010 to HK$675,361,000 in 2011 and the average number of days Siwei's products sat in storage doubling in 2010 to 414 days.

30.     According to the *Reuters'* article, a person with direct involvement with Siwei commented that Siwei was so focused on gaining market share that getting their customers to pay the bill was almost an afterthought.  That source stated that Siwei "would take orders without down payments, so they had to finance the whole thing."

31.     In an interview conducted by *Reuters* with Siwei's former CEO, Wang Fu, he admitted to knowing that Siwei's accounting methodology was bad and that its finance team was

too inexperienced to make improvements.  Wang stated "[b]etter to have market share than to solve every single problem and lose the market."  Wang stated that he raised the issue of accounting problems at Siwei board meetings two or three times, hoping that Caterpillar's more experienced finance team could help, and that the board gave him six months to resolve the issue.

32.     In addition to Siwei's accounting and working capital concerns, there were a number of unusual related party transactions.  Thus, as disclosed in ERA Mining's public filings made in connection with ERA Mining's acquisition of Siwei, bridge loans were issued to Siwei by ERA Mining directors Emory Williams ("Williams"), Li Rubo (also known as John Lee ("Li")) and their affiliates totaling approximately US$6.4 million paying interest of 8% compounded annually.  The interest rate paid to those related parties was higher than certain other outstanding loans owed by Siwei on which it paid rates between 4.9% to 7.4%.  Messrs. William and Li had also advanced a US$2.95 million interest free loan to ERA Mining in order to help it acquire Siwei in 2007.

33.     ERA Mining's public filings with respect to the acquisition of Siwei also disclosed that in 2007, Siwei "disposed" of an asset worth approximately US$5 million to a related entity controlled by Wang Fu for "nil consideration."  Siwei said the asset was loss-making, but continued to purchase millions of dollars' worth of equipment and services from the same firm between 2007 and 2009, paying an average of 2% to 4% above the market rate for the "better quality services provided."

34.     Siwei also transferred a 7.5% interest in a mining equipment firm to one of its partners in order to offset "trade payables."

35.     On May 2, 2012, ERA Mining issued a second Profit Warning stating that: "the

ERA Group expects to record a loss for the first three months ended 31 March 2012 . . ."

**Caterpillar Completes the Acquisition as Previously Announced**

36.     On June 6, 2012, Caterpillar announced the completion of the tender offer to

acquire ERA Mining and Siwei providing, in relevant part, that:

> The tender offer was completed after approval from the Ministry of Commerce of
> the People's Republic of China (MOFCOM). In the tender offer, Caterpillar
> received acceptances in respect of 98.89 percent of ERA common stock and
> approximately 98.26 percent of all outstanding options to purchase ERA common
> stock. Based on the distribution between ERA shares tendered for the all-cash
> alternative and the number of shares tendered for the loan note alternative, the
> final purchase price is estimated at between HKD $5,064 million and HKD
> $5,693 million on a fully diluted basis, depending on ERA's
> performance. Caterpillar intends to exercise its right to compulsorily acquire the
> remaining shares of ERA common stock that it has not purchased to date under
> applicable provisions of the Cayman Island Companies Law, under which ERA is
> incorporated. Caterpillar currently expects to complete the acquisition of the
> remaining shares of ERA common stock in the third quarter of 2012.

37.     On August 6, 2012, Caterpillar filed a Form 10-Q with the SEC providing further

details of the Acquisition, stating in relevant part that:

> Approximately 4 billion Siwei shares were tendered for the cash alternative and
> approximately 1.6 billion Siwei shares were tendered for the loan note alternative.
> The preliminary purchase price of approximately $690 million is comprised of net
> cash paid of approximately $453 million ($475 million in cash paid for shares and
> to cancel share options less cash acquired of $22 million), the fair value of the
> loan notes of $169 million, approximately $155 million of assumed third-party
> short term borrowings, a loan and interest payable to Caterpillar from Siwei of
> $51 million, less restricted cash acquired of approximately $138 million. . . .

> The transaction was financed with available cash and included the issuance of
> loan notes to the former shareholders of Siwei, which have a debt component and
> a portion that is contingent consideration. The $169 million fair value of the loan
> notes is comprised of $152 million of debt representing the minimum redemption
> amount payable in April 2013 and $17 million in contingent consideration
> representing the portion of the redemption amount conditionally payable in April
> 2013 or April 2014. The contingent consideration will be remeasured each
> reporting period at its estimated fair value with any adjustment included in Other
> operating (income) expenses in the Consolidated Results Of Operations.

Tangible assets acquired of $671 million, recorded at their fair values, primarily include cash of $22 million, restricted cash of $138 million, receivables of $213 million, inventory of $105 million and property, plant and equipment of $112 million. Finite-lived intangible assets acquired of $194 million were primarily related to customer relationships and also included trade names. The finite-lived intangible assets are being amortized on a straight-line basis over a weighted average amortization period of approximately 15 years. Liabilities assumed of $592 million, recorded at their fair values, primarily included accounts payable of $342 million, third-party short term borrowings of $155 million and accrued expenses of $50 million. Additionally, deferred tax liabilities were $38 million. Goodwill of $467 million, substantially all of which is non-deductible for income tax purposes, represents the excess of the consideration transferred over the net assets recognized and represents the estimated future economic benefits arising from other assets acquired that could not be individually identified and separately recognized.

38.    As part of the consideration paid for the transaction, Caterpillar issued $169 million in loans notes to certain key Seiwei shareholders, including Williams, Li and James Thompson III ("Thompson" collectively with Williams and Li the "Key Shareholders") who were each former directors and controlling shareholders of ERA Mining prior to the Acquisition. The ultimate value of those loan notes depended on Siwei's gross profits for the 2012 and 2013 fiscal years.

39.    In October 2012, the remaining shares of Siwei common stock were acquired for approximately $7 million in cash.

40.    According to two former Siwei employees interviewed by *Reuters*, Siwei has had no new orders for hydraulic roof supports since Caterpillar completed the Acquisition.  Other former employees reported that the number of working Siwei employees had fallen by more than 50% to approximately 1,900 in September 2013 from 4,300 at the beginning of 2013.

**Caterpillar Writes Down 85% of the Acquisition Price**

41.    In November 2012, the Company purportedly became aware of certain discrepancies between the inventory recorded in Siwei's accounting records and the company's

-11-

actual physical inventory.  Caterpillar promptly launched a review and investigation into the nature and scope of the discrepancy.  The extensive review revealed inappropriate accounting practices involving improper cost allocation that resulted in overstated profit.   The investigation also identified improper revenue recognition practices involving early and, at times unsupported, revenue recognition.

42.    On January 16, 2013, Caterpillar's Audit Committee met and determined that the goodwill recorded in connection with the Acquisition was impaired.  Accordingly, the Audit Committee determined that a *$580 million* goodwill impairment charge would be recognized by the Company in the fourth quarter ending December 31, 2012.  Notably the $580 million goodwill charge exceeded the original goodwill amount of $467 million disclosed by Caterpillar in August 2012 (¶37, *supra*.).

43.    On January 18, 2013, Caterpillar filed a Form 8-K with the SEC and issued a press release disclosing the Siwei investigation and the *$580 million* goodwill impairment charge.  The press release provides, in relevant part, that:

> PEORIA, Ill. – Caterpillar Inc. (NYSE: CAT) today announced that an internal investigation of its recently acquired company, ERA Mining Machinery Limited (ERA), including its wholly owned subsidiary Zhengzhou Siwei Mechanical & Electrical Manufacturing Co., Ltd., commonly known as "Siwei," has uncovered deliberate, multi-year, coordinated accounting misconduct concealed at Siwei, located in Zhengzhou, China.
>
> ***Caterpillar's investigation determined several Siwei senior managers engaged in deliberate misconduct beginning several years prior to Caterpillar's acquisition of Siwei.*** This deliberate misconduct at Siwei will result in a non-cash ***goodwill impairment charge of approximately $580 million***, or $0.87 per share, in the fourth quarter of 2012.
>
> Caterpillar removed several senior managers at Siwei who were responsible for the misconduct and a new leadership team has been put in place. The responsibilities for Siwei manufacturing operations have been moved to Caterpillar's China Operations Division, led by Vice President Qihua Chen, a long time Caterpillar employee. The sales and support organization at Siwei will

-12-

report to Kebao Yang, Caterpillar Global Mining General Manager for China and Korea.

"The actions carried out by these individuals are offensive and completely unacceptable. This conduct does not represent, in any way, shape or form, the way Caterpillar does business or how we expect our employees to work, which is spelled out in Caterpillar's Worldwide Code of Conduct," said Caterpillar Chairman and CEO Doug Oberhelman. "Once our investigation confirmed that misconduct had taken place at Siwei, we moved quickly and decisively to hold the responsible leaders directly accountable for the wrongdoing. Accountability is a critical way that we measure leaders at Caterpillar, and it is my expectation that leaders set an example and are accountable for their actions and results."

Caterpillar has advised the Hong Kong Securities and Futures Commission of these issues and has filed a Form 8-K with the United States Securities and Exchange Commission disclosing the impairment charge. Caterpillar's investigation is ongoing. [Emphasis added].

44.     An interview conducted by *Reuters* with Wang Fu provides a different

perspective with respect to the accounting discrepancies:

Wang said he mobilized employees in finance, sales, manufacturing and technology to dig into the accounting issues following the acquisition. At the time, Wang said, nobody knew exactly how bad things were.

By October 2012, Wang found that costs were sometimes allocated to incorrect projects. Other times, the company had simply not capitalized costs, or had accounted for them improperly on Siwei's balance sheet. Siwei had also double-booked some sales, which led to inventory discrepancies.

At the same time, however, by Wang's estimates, the company's income had been underreported by about 170 million yuan because it had under-valued equipment made in-house.

                                    *     *     *

Wang feels Caterpillar never had a "comprehensive understanding" of Siwei's financial situation and believes he was the scapegoat.

"It looks like it is precisely to justify and cover up a dereliction of duty by their so-called elite teams that an easily discovered management issue is labeled as deliberate, intentional fraud," he said.

45.     On January 20, 2013, *The Wall Street Journal* reported that the Company had

removed defendant de Leon as a result of the Siwei fiasco.  Defendant de Leon joined Caterpillar

as a result of the Company's 2010 acquisition of Bucyrus International Inc. ("Bucyrus"), which also manufactured mining roof supports. Bucyrus was reportedly looked into purchasing Siwei prior to the Company's acquisition of Bucyrus.

46.     On January 28, 2013, defendant Oberhelman participated in an earnings conference call in which he admitted responsibility for the Acquisition stating:

> I recognize the decision to acquire Siwei happened on my watch and the buck stops at my desk. I am accountable for that acquisition.

47.     On February 19, 2013, Caterpillar filed a Form 10-K with the SEC disclosing that the preliminary purchase price for Siwei was approximately $677 million. The Company also revised certain of its accounting in connection with the Acquisition increasing goodwill to $625 million from $467 million originally disclosed in August 2012 (¶37, *supra*.).

48.     A number of commentators have questioned whether Caterpillar turned a blind eye to the issues at Siwei in hot pursuit of Chinese assets. Indeed, the January 23, 2014 *Reuters* article overtly questions whether "Caterpillar chose to ignore existing or potential problems and push ahead with the deal."

49.     On January 24, 2013, *Reuters* published an article entitled "Red Flags Revealed in Filings of Firm Linked to Caterpillar Fraud" stating that investors and corporate governance experts agreed the unusual ERA Mining related party transactions were "red flags that should have prompted Caterpillar and its team of lawyers, accountants and banker to ask some searching questions before pulling the trigger on the deal."

50.     On or about February 12, 2013, the *Financial Times* published an article stating that: "[t]he trouble with ERA began far before the deal was signed." The *Financial Times* article cites ERA Mining's Profit Warnings and the partial payment for the Acquisition in loan notes which could be reduced if ERA Mining's performance suffered.

-14-

51.     On or about March 4, 2013, *Forbes* published an article entitled "Cat Scammed: How a U.S. Company Blew Half A Billion Dollars in China" stating that "the warnings signs were flashing" prior to the Acquisition.  Those warnings included that Siwei was running low on cash and "had a mountain of unpaid bills."  *Forbes* cites inside sources as stating that Caterpillar was aware of Siwei's credit crunch but was undeterred.

**Defendants Ignored Red Flags Existing Prior to the Acquisition**

52.     Prior to the time of the Acquisition Defendants became aware of "red flags" calling into question the reliability of Siwei's reported financial condition and profitability of its operations.  These include:

(a)     Defendants learning that Siwei's customers were not paying their bills in a timely fashion and that Siwei would require an immediate $50 million loan for working capital (*see* ¶21, *supra.*);

(b)     Defendants learning that Siwei had not made required overtime payments to workers and did not hold required Chinese operating permits (*see* ¶21, *supra.*);

(c)     Defendants knowing or recklessly disregarding that ERA Mining had issued two Profit Warnings prior to the Acquisition (*see* ¶¶23 and 35, *supra.*);

(d)     There being a number of unusual related party transaction between Siwei and its affiliates were publicly known as they were contained in ERA Mining's public filing made with the Hong Kong Exchange (*see* ¶¶32-34, *supra.*); and

(e)     Defendants knowingly or recklessly disregarding the red flags presented in ERA Mining's publicly filed financial statements which showed, *inter alia*, that trade receivables had been growing at an alarming rate and had, in fact, began exceeding sales in 2010 (*see* ¶27, *supra.*).  Those financial statements additionally showed that Siwei's inventories were also substantially increasing (*see* ¶29, *supra.*).

53.     A report issued on February 1, 2013 by corporate governance analytics firm GMI Ratings calls into question Caterpillar's failure to heed those obvious red flags:

After Caterpillar Inc. bought a company in June for hundreds of millions too much, the equipment maker's CEO Doug Oberhelman explained on a conference call this week that the managers "deliberately misled" his team. Even so, ***Caterpillar should have done more due diligence and had better oversight.***

Caterpillar continues investigating what it called the "deliberate, multi-year, coordinated accounting misconduct" at the Chinese underground coal company Zhengzhou Siwei Mechanical & Electrical Manufacturing Co., Ltd. The company downwardly revised its earlier estimation of Siwei's parent ERA Mining Machinery Limited (HKSE: 8043) by $580 million, or most of what it had paid for the Chinese underground coal company. Interestingly, Caterpillar originally identified $467 million, or 68% of the June $690 million purchase price as goodwill, but has now impaired goodwill by $580 million.

The write-down and lower sales dented Caterpillar's profit during the fourth quarter to $697 million, nearly 55% lower than in the same period last year. Yet Steve Wunning, Caterpillar group president with responsibility for Resource Industries, called the Siwei acquisition "well aligned with our strategy to expand our role as a leading equipment and solutions provider for the Chinese coal mining industry" in the same statement that announced the Siwei write-down on January 18. Mr. Oberhelman said on the conference call this week that his team has already made "progress" on significantly lowering Siwei's most significant cost driver, steel, which is just one example of how they are leveraging Caterpillar's scale and global network to improve Siwei's operation.

***Regardless of the specific financial impact of the fraud, the manner in which the ERA deal was executed raises serious questions concerning Caterpillar's oversight.***  After the fraud discovery, Reuters reported that ERA's public filings clearly disclosed a  web of related party transactions, oddly structured insider loans and questionable asset transfers – any one of which should have raised red

flags to an outsider.  Combined with the general prevalence of fraudulent accounting at many Chinese companies it becomes clear that Caterpillar did not properly exercise its judgment.

**GMI Ratings considers any related party transactions between directors or officers, regardless of size as a red flag.  While they may not signal outright fraud, such transactions may indicate a management and board that are willing to play fast and loose with the rules, and push the boundaries in other aspects of their business.**  As such, the existence of such transactions among the companies we rate, are factored negatively into the ESG® rating model.  Unfortunately, it appears that Caterpillar did not hold the same aversion to related party transactions at the time of the ERA Mining acquisition.

\*    \*    \*

Though Mr. Oberhelman ultimately took full responsibility for ERA Mining fiasco, it appears at the very least the board did not ask the right questions of management and at the very worst was disengaged during the entire acquisition process.  In a broader sense, **the lack of due diligence is troubling, given that the problems with ERA Mining were readily apparent and in full view.**  The board will clearly need to provide better oversight and perform at a much higher level in order to avoid potential problems related to corruption, anti-competitive behavior and the environment that seem to be the current burden of many large multinational corporations. [Emphasis added.]

**Caterpillar Enters Into a Settlement In Connection With the Acquisition**

54.     On May 16, 2013, Caterpillar filed a Form 8-K with the SEC and issued a press release announcing that it had entered into a settlement agreement with the Key Shareholders who had accepted loan notes as partial consideration for the Acquisition.

55.     Under the terms of the agreement the loan notes issued as consideration for the Acquisition with a book value approximately $152 million and with obligations of Williams and Li of approximately $12.5 million would be cancelled and discharged in exchange for a payment of approximately $29.5 million on behalf of Caterpillar.  The settlement agreement contained a mutual release and discharge of the parties and an agreement by Caterpillar not to pursue any claims against the auditors or former directors of ERA Mining or the former directors of Siwei.

56.     Also on May 16, 2013, Caterpillar agreed to sell certain accounts receivables and inventory of Siwei to Mining Machinery Limited (an entity controlled by the Key Shareholders) for approximately $10 million, which was approximately Caterpillar's book value.

57.     The settlement resulted in a $135 million favorable impact to Caterpillar's second quarter results for the period ending June 30, 2013.

## DERIVATIVE AND DEMAND ALLEGATIONS

58.     Plaintiffs brings this shareholder derivative action on behalf of Caterpillar to redress injuries suffered and to be suffered by the Company.  Plaintiff will adequately and fairly represent the interests of Caterpillar in enforcing and prosecuting its rights.  This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

59.     On June 25, 2014, Plaintiffs, through their attorneys, sent a demand letter (the "Demand") to Caterpillar's Board demanding that the Board investigate any potential claims arising out of the Acquisition including claims for breach of fiduciary duty against defendants Oberhelman, Wunning, Rapp and de Leon and institute corporate governance reforms designed to prevent any similar future maleficence in the context of corporate acquisitions.  A copy of the Demand is attached hereto as Exhibit A.

60.     On July 8, 2014, the Company's counsel Sidley Austin LLP ("Sidley") wrote a letter in response to the Demand requesting that Plaintiffs provide evidence of their continuous and contemporaneous ownership of Caterpillar stock and stated that upon such proof the Board would consider the Demand at its next regularly scheduled meeting to be held in August 2014. A copy of that letter is attached hereto as Exhibit B.

61.     On July 17, 2014, Plaintiffs' counsel addressed a letter to Sidley attaching proof of their ownership of Caterpillar stock, a copy of which is attached hereto as Exhibit C.

62.     On July 21, 2014, Sidley wrote a letter, a copy of which is attached hereto as Exhibit D, requesting additional information concerning Plaintiffs' ownership of Caterpillar stock.

63.     On July 23, 2014, Plaintiffs' counsel wrote to Sidley in order to clarify questions as to Plaintiffs' ownership and to reiterate that the Demand should be considered at the Board's next meeting.  A copy of that letter is attached hereto as Exhibit E.

64.     On July 31, 2014, Sidley requested that Plaintiffs provide declarations concerning their continuous ownership of Caterpillar stock.

65.     On August 8, 2014, Plaintiffs sent Sidley declarations further evidencing their continuous ownership of Caterpillar stock.

66.     On August 29, 2014, Sidley wrote to Plaintiffs informing them that the Demand had been considered and that the Board had determined that given the shareholder derivative actions pending in the United States District Court for the Central District of Illinois alleging similar allegations based upon a theory of demand futility, "it would not be a prudent expenditure of time and resources for [the Board] to conduct additional inquiry into the allegations raised in your [Demand] letter at this point in time."  A copy of that letter is attached hereto as Exhibit F.

67.     On September 30, 2014, Plaintiffs' counsel wrote to Sidley stating that the Board's refusal to consider the Demand in a timely fashion was unreasonable and contrary to Delaware law.  Moreover, Plaintiffs asserted that the Board's continued delay in considering the Demand potentially compromised any claims to the extent that they would need to be asserted within the applicable limitations period.  A copy of that letter is attached hereto as Exhibit G.

68.     On or about November 13, 2014, Plaintiffs' counsel held a telephone conference with the Company's counsel at Sidley.  Plaintiffs voiced their concerns that the Board's continued refusal to take any action as to the Demand would implicate concerns with respect to any applicable statutes of limitations and also inquired into Defendants' willingness to enter into tolling agreements.  Defendants' counsel stated that they did not believe any tolling agreements would be appropriate at that time and that they would provide Plaintiffs with an analysis concerning the tolling of the statutes of limitations.

69.     On December 2, 2014, Plaintiffs' counsel wrote to inquire as to whether Defendants' counsel would be providing any analysis concerning or precedents confirming that shareholders who make a demand need not obtain a tolling agreement in order to prevent the statute of limitations running with respect to any potential action.  A copy of that e-mail is attached hereto as Exhibit H.

70.     Defendants' counsel has still failed to provide Plaintiffs' counsel with any statute of limitations analysis and the Board appears to have taken no further action with respect to Plaintiffs' Demand.

71.     Plaintiffs' Demand has been effectively refused by the Board's refusal to take any action as requested in the Demand, including, but not limited to, conducting an investigation and instituting legal proceedings against Defendants for breach of fiduciary duty.

**CLAIM FOR RELIEF**
**Against the Individual Defendants for Breach of Fiduciary Duty**

72.     Plaintiffs incorporate by reference and reallege each and every allegation made above as if fully set forth herein.  This claim is brought by Plaintiffs derivatively on behalf of the Company against the Individual Defendants for breaches of fiduciary duty.

73.     Defendants owed fiduciary duties to the Company.  Defendants breached their fiduciary duties of good faith, fair dealing, loyalty and care by proceeding with the Acquisition and recommending that Caterpillar proceed with the Acquisition despite knowing, or recklessly disregarding, adverse information regarding the financial condition and operations of ERA and Siwei.  These actions could not have been a good faith exercise of prudent business judgment.

74.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Caterpillar has suffered significant damages and Defendants are, therefore, liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Declaring that Defendants breached their fiduciary duties to Caterpillar;

B.     Entering judgment against the Defendants and directing the Defendants to account to Caterpillar for all damages sustained by the Company by reason of the wrongs alleged herein;

C.     Directing Caterpillar to take all necessary steps to reform and improve its corporate governance and internal procedures to protect the Company and its shareholders from a repeat of the wrongful conduct alleged herein;

D.     Awarding  the costs and disbursements of this action, together with reasonable attorneys' fees and the reimbursement of expenses; and

E.     Granting such other and further relief as the Court may deem just and proper.

Dated:  March 8, 2015

**WINSTEIN, KAVENSKY
  & CUNNINGHAM, LLC**


___/S/John Malvik_____

John Malvik
224 18th Street
4th Floor U.S. Banking Building
Rock Island, IL 61201
Tel:    (309) 794-1515
Fax:    (309) 794-9929
*jmalvik@wkclawfirm.com*

**ABRAHAM, FRUCHTER & TWERSKY, LLP**
Jeffrey S. Abraham, Esq.
Philip T. Taylor, Esq.
One Penn Plaza; Suite 2805
New York, New York 10119
Tel:    (212) 279-5050
Fax:    (212) 279-3655
*jabraham@aftlaw.com*
*ptaylor@aftlaw.com*

 **KANTROWITZ, GOLDHAMER
  & GRAIFMAN, P.C.**
Gary S. Graifman, Esq.
210 Summit Avenue
Montvale, New Jersey 07645
Tel:    (201) 391-7000
Fax:    (201) 307-1088
*ggraifman@kgglaw.com*

**Attorneys for Plaintiffs Robert Lowinger
and Issek Fuchs**