E-FILED
Friday, 31 May, 2019 11:03:55 AM
Clerk, U.S. District Court, ILCD

In the

# United States Court of Appeals
### For the Seventh Circuit



_____

No. 18-1863

ROBERT LOWINGER, *et al.*,

                            *Plaintiffs-Appellants*,

*v.*

DOUGLAS R. OBERHELMAN, *et al.*,

                            *Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:15-cv-01109-SLD-JEH — **Sara L. Darrow**, *Chief Judge*.

_____

ARGUED NOVEMBER 1, 2018 — DECIDED MAY 9, 2019

_____

Before WOOD, *Chief Judge*, and MANION and ROVNER, *Circuit Judges*.

WOOD, *Chief Judge*. In the fall of 2011 Caterpillar Inc. began making serious inquiries about the possible acquisition of a Chinese mining company, ERA Mining Machinery Ltd., and its wholly-owned subsidiary, Zhengzhou Siwei Mechanical & Electrical Equipment Manufacturing Co., Ltd. (We refer to the two companies as "Siwei" for simplicity.) Caterpillar completed that acquisition in June 2012. Only after the closing did

Caterpillar gain access to Siwei's physical inventory. What it found was unsettling. An inspection of the inventory revealed that Siwei had overstated its profits and improperly recognized revenue. As a result, Caterpillar took a $580 million goodwill impairment charge just months after the acquisition was completed. Plaintiffs Robert Lowinger and Issek Fuchs, both Caterpillar shareholders, now bring this shareholder derivative suit alleging that several former Caterpillar officers breached their fiduciary duties by failing to conduct an adequate investigation of the Siwei acquisition. (We call them the Lowinger Plaintiffs.) That failure, they contend, caused Caterpillar's loss. The Lowinger Plaintiffs made a demand that the Caterpillar Board bring this litigation; the Board refused; and in this lawsuit, they argue that the Board's refusal was improper.

The district court granted the Officers' motion to dismiss the complaint for failure adequately to allege that the Board wrongfully refused to pursue the Lowinger Plaintiffs' claim, FED. R. CIV. P. 23.1(b)(3); it then denied plaintiffs' motion for leave to amend. We affirm.

# I

## A

In 2010 Caterpillar, a construction and mining equipment manufacturer, was hoping to gain a greater foothold in the Chinese market. According to the Lowinger Plaintiffs—whose well pleaded allegations we must accept as true at this stage—in August of that year defendant Douglas Oberhelman, Caterpillar's then-CEO, told investors that Caterpillar was "stepping up big time" in the Chinese market and that "[W]e're going to win. We will win in China." Following this

proclamation, defendants Edward Rapp, Caterpillar's CFO, and Steven Wunning, Caterpillar's Group President, began to advocate for Caterpillar to purchase Siwei, a Chinese mining company that manufactures hydraulic mining roof supports. (We refer to the defendants collectively as the Officers unless the context requires otherwise.)

Caterpillar began its investigation of the Siwei acquisition in October 2011. To perform the necessary financial analysis, Caterpillar hired the accounting firm Ernst & Young ("E&Y"). E&Y's inquiry was limited, however, because Siwei's auditors refused to allow E&Y to review their audit work papers. Instead E&Y was forced to rely on oral statements from those auditors, along with Siwei's publicly reported financial statements. Despite the limited scope of its review, E&Y's report raised several financial red flags: Siwei's declining gross profit margins; long-aged accounts receivable; and working capital and cash flow problems. In its report, E&Y recommended that Caterpillar undertake additional investigation, but Caterpillar never did so. In addition to the issues identified by E&Y, an examination performed by a recently acquired Caterpillar subsidiary, Bucyrus International, Inc., suggested reasons for concern. Bucyrus's research, of which Caterpillar was aware, suggested that Siwei might be plagued by a host of potential fraud and anti-corruption problems. At least in part for those reasons, Bucyrus had scuttled its own attempted purchase of Siwei.

As the acquisition process continued, other headaches emerged. Caterpillar discovered that Siwei needed an immediate $50 million loan; that Siwei's customers were not paying their bills on time; and that Siwei had engaged in several

suspicious transactions with closely related parties, including its parent company's directors and its former CEO.

Notwithstanding these alerts, Caterpillar entered into an acquisition agreement with Siwei in November 2011. Bad news was not far behind. In March 2012, before the acquisition was completed, Siwei informed Caterpillar that instead of the $16 million profit it was expected to report in 2011, it would record a $2 million loss. In its 2011 Annual Report, Siwei disclosed not only this loss, but numerous other troubles. For example, its accounts receivable had grown from 320 to 371 days outstanding, its "allowances for bad and doubtful debts" had increased over 450%, and its debt had ballooned. Siwei explained many of these issues as results of its aggressive attempts to gain market share at the expense of other metrics. Despite everything, on June 6, 2012, Caterpillar completed its tender offer to acquire Siwei for approximately $690 million.

With the acquisition complete, Caterpillar gained access to Siwei's physical inventory. Only then did Caterpillar realize that discrepancies existed between Siwei's physical inventory and the inventories it recorded in its accounting records. The resulting investigation uncovered inappropriate accounting practices that led to overstated profit and early or unsupported revenue recognition. As a result, Caterpillar determined that it would have to recognize a $580 million loss in the form of a goodwill impairment charge. It announced this step publicly in January 2013. At the same time, Caterpillar's Board approved the departure of Luis de Leon, Caterpillar's mining product vice president, at least in part because of his role in the Siwei acquisition.

After recording the $580 million goodwill impairment charge, Caterpillar retained the law firm Sidley Austin LLP to investigate the Siwei acquisition. In July 2013, Sidley provided a report to Caterpillar's board and audit committee detailing its findings. The Board then imposed financial penalties on some Caterpillar executives, including Oberhelman. Neither the amount nor the existence of these penalties, however, was ever disclosed in Caterpillar's public filings.

Shortly after this, several major corporate news outlets, including *Forbes*, *Reuters*, and the *Financial Times*, ran articles detailing the story of the acquisition and chiding Caterpillar and its board for what those outlets viewed as insufficient investigation and oversight. Several months after these stories ran, Caterpillar settled with Siwei's former directors and controlling shareholders, releasing them from claims in exchange for a settlement that benefitted Caterpillar by $135 million for its 2013 second quarter results.

B

Litigation soon followed. First, a group of shareholders brought a derivative action based on a theory that the Board was conflicted and so it was futile to ask the Board to sue Caterpillar's officers and directors (the "Demand Futility Action"). On June 25, 2014, while the Demand Futility Action was pending, the Lowinger Plaintiffs made a demand on the Board. They called on the Board to begin litigation against the Officers, or any other responsible party, with respect to the losses Caterpillar suffered because of the acquisition. The Board declined to respond formally to this demand, because if the Demand Futility Action was successful, shareholders would not need first to make a demand on the Board to bring litigation. It reasoned that any time or resources spent

responding to the Lowinger Plaintiffs' demand would in that case have been wasted. Also during this period, the Board declined to enter into any tolling agreements to suspend applicable statutes of limitation, as its counsel believed the Demand Futility Action tolled the relevant limitations periods.

The Board sought to stay this case while the Demand Futility Action remained pending, but the district court denied that request on March 28, 2016. At that point, the Board retained the law firm Jones Day to investigate the allegations in the Lowinger Plaintiffs' demand. On November 1, 2016, Caterpillar provided the Lowinger Plaintiffs with a redacted version of Jones Day's report. That report, based on interviews with 17 current and former Caterpillar employees and a consultation with a Jones Day partner with expertise in Chinese acquisitions, detailed Jones Day's investigation into the Siwei acquisition. The report also contained analyses of the competing benefits and risks of bringing litigation, including the chance of success of a lawsuit against any Caterpillar officers or external advisors involved in the Siwei acquisition.

Jones Day ultimately concluded that the likelihood of success in litigation was slim, and that any potential success was likely to be undercut by Caterpillar's duty to indemnify its former officers in most scenarios, as well as by business considerations (such as the hit to corporate morale that litigation might cause). Based on Jones Day's report and recommendation, the Board refused the Lowinger Plaintiffs' demand. The Lowinger Plaintiffs filed their complaint against the Officers in March 2015.

Rather than amending their complaint to reflect that refusal, the Lowinger Plaintiffs continued to argue that the Board's initial delay in responding to their demand was

sufficient by itself to allow them to pursue this litigation. The district court granted the Officers' motion to dismiss that complaint, holding that the Board's decision to delay was protected by the business judgment rule, but it gave the Lowinger Plaintiffs leave to amend. They did so, this time alleging that the Board's refusal to accede to their demand was wrongful because Jones Day was not an independent investigator and its report had numerous fatal flaws. The Officers again moved to dismiss. This time the district court granted their motion and dismissed the action with prejudice. This timely appeal followed.

## II

Under Federal Rule of Civil Procedure 23.1(b)(3), a shareholder plaintiff must "state with particularity" his efforts to obtain his desired action from the company's directors, and "the reasons for not obtaining the action or not making the effort." *Id.* at 23.1(b)(3)(A), (B). We review *de novo* the district court's determination whether a plaintiff has met this standard. *Westmoreland Cnty. Emp. Ret. Sys. v. Parkinson*, 727 F.3d 719, 724 (7th Cir. 2013). Though federal law determines whether a plaintiff has stated the facts with sufficient detail, state law determines whether a plaintiff's stated reasons are sufficient as a matter of substantive law. See *id.* at 722. We must look first to Illinois's choice-of-law rules, both sides agree; those rules direct us to the law of Delaware, Caterpillar's state of incorporation. See *CDX Liquidating Trust v. Venrock Assocs.*, 640 F.3d 209, 212 (7th Cir. 2011).

Under Delaware law, where a plaintiff makes a litigation demand on the board, she effectively concedes that the board is independent and able to respond. The board's decision to refuse that demand is thus protected by the business

judgment rule. See *Spiegel v. Buntrock*, 571 A.2d 767, 775–76 (Del. 1990). "The business judgment rule is a presumption that in making a business decision … the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Id.* at 774.

The combination of a heightened pleading standard and Delaware's business judgment rule puts plaintiffs in this kind of case between the proverbial rock and a hard place. See *Bresalier v. Good*, 246 F. Supp. 3d 1044, 1052 (D. Del. 2017) ("The combination of Rule 23.1 and Delaware law places on plaintiffs whose demand has been refused [a] 'heavy' burden ….") (quoting *Ironworkers Dist. Council of Philadelphia & Vicinity Ret. & Pension Plan v. Andreotti*, C.A. No. 9714–VCG, 2015 WL 2270673, at *24 (Del. Ch. May 8, 2015)). We should note in this connection that, unlike many jurisdictions, Delaware permits the citation of unpublished decisions of the Delaware courts as precedent. See *New Castle Cnty. v. Goodman*, 461 A.2d 1012, 1013 (Del. 1983) ("[L]itigants before this Court may cite Orders as precedent …."); see also *Issa v. Delaware State Univ.*, 268 F. Supp. 3d 624, 631 n.1 (D. Del. 2017) (noting that *Goodman* remains good law despite a change in the Delaware Supreme Court's rule allowing citations to non-precedential decisions).

The only way that a shareholder plaintiff can walk this tightrope and overcome the business judgment rule's presumption is to allege particularized facts that create a reasonable doubt about "the good faith and reasonableness of [the board's] investigation." *Spiegel*, 571 A.2d at 777. In other words, a shareholder plaintiff must create reasonable doubt that the board upheld its duties of care and loyalty by making

No. 18-1863                                                                9

an informed decision and acting in good faith. See *Andreotti*, 2015 WL 2270673, at *24. We thus turn to the question whether the Lowinger Plaintiffs have overcome that presumption here.

A

The question we face is a narrow one. It is not whether the Siwei acquisition was good or bad for Caterpillar. Nor are we concerned with whether Caterpillar's board made the right decision by not bringing litigation against its former officers. Instead, our review is confined to whether the Board's decision not to litigate is protected by the wide bounds of the business judgment rule, or if the Lowinger Plaintiffs have managed to allege with particularity facts suggesting that the Board's decision was irrational or the result of a grossly negligent process. The plaintiffs can meet their burden by pleading facts that show that the Board's decision "cannot be attributed to a rational business purpose" or that the Board reached its "decision by a grossly negligent process that includes the failure to consider all material facts reasonably available." *Brehm v. Eisner*, 746 A.2d 244, 264 n.66 (Del. 2000).

The Lowinger Plaintiffs' most serious allegation is that Jones Day could not independently evaluate Caterpillar's claims because that firm also represented E&Y and Citigroup, two of the possible defendants in any litigation about the Siwei acquisition. Moreover, plaintiffs note, Jones Day also relied on Sidley's investigation of the Siwei acquisition, but Sidley was conflicted because it represented the corporate officers in both this case and the Demand Futility Action.

It is true that conflicts can undermine the business judgment rule. In *Stepak v. Addison*, 20 F.3d 398 (11th Cir. 1994), for

example, the Eleventh Circuit found an impermissible conflict when a firm "actually represented the alleged wrongdoers in proceedings related to the very subject matter that the law firm is now asked to neutrally investigate." *Id.* at 405. The Illinois Rules of Professional Conduct similarly forbid concurrent representation when a lawyer's representation will be "directly adverse to another client" or where the relationship to a current or past client "will materially interfere with the lawyer's independent professional judgment." Ill. R. Prof'l Conduct R. 1.7 & cmt. 8 (2010); see also *id.* R. 1.9 (discussing duties owed to former clients).

But these plaintiffs have not alleged with particularity any potentially disqualifying conflicts. Their only reference to Jones Day's representation of E&Y and Citigroup is that Jones Day "regularly represents and works together with both of those entities." This is not enough to give us the information that we would need to decide whether Jones Day was actually conflicted. The mere fact that a law firm represented a client on some other matter does not automatically disqualify the firm whenever that client may be involved as an opposing party in future litigation. See, *e.g.*, *Watkins v. Trans Union, LLC*, 869 F.3d 514, 519–23 (7th Cir. 2017) (holding that the Indiana Rules of Professional Conduct did not disqualify a lawyer from working adversely to a former client). Without more detailed allegations, we are missing critical facts: did Jones Day's representations of E&Y and Citigroup occur in "the same or a substantially related matter," as required by Illinois Rule of Professional Conduct 1.9; how did that representation "materially limit[]" Jones Day's advice for Caterpillar, Rule 1.7; was the representation of E&Y and Citigroup ongoing or wholly in the past? Compare *id.* R. 1.7 ("Conflict of Interest: Current Clients") with *id.* R. 1.9 ("Duties to Former Clients").

Indeed, because Jones Day, E&Y, and Citigroup are all international firms, it would be important to know on what continents this work occurred; that information, too, is missing. The Lowinger Plaintiffs simply have not provided enough information about Jones Day's representation of Citigroup and E&Y to reveal with particularity any conflict that creates a reasonable doubt about the Board's business judgment.

Their allegation that Jones Day relied on Sidley's investigative report is similarly flawed. The Lowinger Plaintiffs state only that "Jones Day's investigation lacked independence and was compromised because it relied, in large part, on information provided by Sidley…." But they provide no details suggesting how Jones Day relied on Sidley. More importantly, they allege nothing that would suggest that Jones Day did not independently investigate and analyze everything discussed in its report.

We are aware that the Lowinger Plaintiffs cite to pages 42 and 43 of Jones Day's investigatory report as an example of Jones Day's "reliance" on Sidley. But the report's only mention of Sidley on those pages states that Sidley investigated claims against Siwei's principals prior to Caterpillar's settlement with those principals. As a result, Jones Day believed that Caterpillar appeared to have considered the risks and benefits of litigation against those principals. It is a stretch to characterize that as "reliance" on Sidley. The report continues that *regardless* of Sidley's investigation, "any potential litigation against these parties would be barred under the terms of the settlement." This conclusion has nothing to do with Sidley. It can be interpreted only as the result of Jones Day's own legal analysis of the settlement. That is not enough to allege Jones Day's conflict with the detail required by Rule 23.1.

B

The Lowinger Plaintiffs' other arguments fall into two buckets: the Board's allegedly improper lack of response to their demand, and perceived inadequacies in Jones Day's investigation. The Board's decision to delay responding to their demand while the Demand Futility Action was pending does not create a reasonable doubt with respect to the Board's business judgment. If anything, that was a prudent business decision. If the Demand Futility Action had been successful, then the Board would be disqualified from responding to a demand, and so any resources spent responding to the Lowinger Plaintiffs' demand would have been wasted.

The Lowinger Plaintiffs counter that the Board risked making certain claims time-barred by delaying a response. They contend that the Board could have mitigated this risk by entering into tolling agreements, but that it refused to do so. That failure to mitigate, Lowinger Plaintiffs contend, raises a reasonable doubt about their business judgment. But as the Lowinger Plaintiffs' complaint illustrates, they made this argument about the statute of limitations to Sidley, the Board's counsel, and it disagreed. The only reasonable inference to draw from this exchange is that the Board relied on its counsel's legal advice when deciding to delay a response without tolling agreements. That advice was not so erroneous that relying on it was grossly negligent. Indeed, the district court believed that Sidley's advice on the statute of limitations was correct.

The Board's refusal to release the unredacted appendix to Jones Day's report and the documents underlying that report also fails to create doubt about the Board's judgment. Unlike the defendants in the cases cited by the Lowinger Plaintiffs,

No. 18-1863 13

Caterpillar has not "effectively insulated its investigation from any scrutiny." *City of Orlando Police Pension Fund v. Page*, 970 F. Supp. 2d 1022, 1030 (N.D. Cal. 2013); see also *Thorpe v. CERBCO, Inc.*, 611 A.2d 5, 11 (Del. Ch. 1991) (finding a reasonable doubt as to a board's good faith where it refused to act on a demand, refused to release the special committee's report prepared for the board, and the special committee members on the board resigned after tendering their report). The Board gave the plaintiffs the entirety of the report provided to the Board except for four pages of redacted appendices that it claimed were subject to attorney-client privilege. This is a far cry from *City of Orlando*, where the board provided plaintiff's *counsel* with nothing more than a copy of the report, and then only for the limited purpose of preparing for settlement negotiations. 970 F. Supp. 2d at 1030–31.

If the Lowinger Plaintiffs believed these documents were vital to their claims, they should have made a books and records demand under 8 Delaware Code § 220 once their first complaint was dismissed with leave to amend. See *Andersen v. Mattel, Inc.*, C.A. No. 11816–VCMR, 2017 WL 218913, at *4 (Del. Ch. Jan. 19, 2017) (rejecting a shareholder's argument that a board kept its materials secret when that shareholder had chosen not to make a section 220 demand). Their argument that they could not make a section 220 demand once they filed their initial complaint is inconsistent with the Delaware Supreme Court's decision in *King v. VeriFone Holdings, Inc.*, 12 A.3d 1140 (Del. 2011). *King* held that a section 220 action was available when a shareholder's derivative action was dismissed without prejudice for failure to plead particularized facts and the shareholder was given leave to amend. *Id.* at 1150. While *King* dealt with the failure to plead facts suggesting demand futility, we see no reason that it would not

apply equally to the demand-refusal context. In both scenarios, shareholder-plaintiffs are seeking similar facts that would allow them to meet Rule 23.1(b)'s "particularity" pleading standard. See *id.* at 1147–48 (approving of a section 220 demand made after a shareholder's first complaint "failed to plead particularized facts").

No Delaware case, statute, or rule expressly forecloses the plaintiffs' section 220 demand. For that reason, the district court was correct not to excuse their failure to attempt such a demand. Absent a failed section 220 action, the Board's decision not to release further investigation documents does not create a reasonable doubt as to its judgment.

The Lowinger Plaintiffs finally attempt to create doubt about the Board's judgment by attacking various parts of Jones Day's legal and factual analysis, and the choices it made about whom and whom not to interview. But these arguments all amount to "cavils about the types of documents reviewed, or the choice of persons to be interviewed" that "will not support a finding of gross negligence." *Zucker v. Hassell*, C.A. No. 11625–VCG, 2016 WL 7011351, at *9 (Del. Ch. Nov. 30, 2016). These plaintiffs might come to a different conclusion about the strategic importance of the acquisition, the risk that litigation might cause disruption and excessive cost for Caterpillar, or the need to interview Siwei's former CEO. But those types of business and investigative choices are exactly what the business judgment rule protects. See *Andreotti*, 2015 WL 2270673, at *25. More to the point, nothing about Jones Day's process, or its legal or factual analysis, was so egregiously deficient that the Board was grossly negligent to rely on it. And it is egregiousness that Delaware requires to rebut the business judgment rule's protections. See *Belendiuk v. Carrion*,

No. 18-1863 15

Civil Action No. 9026–ML, 2014 WL 3589500, at *7 (Del. Ch. July 22, 2014) (discussing the few cases that "illustrate the specificity of the allegations and the egregiousness of the conduct that this Court has found rises to the level of wrongful refusal"); see also *Zucker*, 2016 WL 7011351, at *10 & n.117.

### III

The Lowinger Plaintiffs contend that even if their complaint was properly dismissed, the district court should have allowed them yet another opportunity to amend. Because "district courts have broad discretion to deny leave to amend where there is undue delay … [or] undue prejudice to the defendants," the abuse of discretion standard applies. *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008). We see no such abuse here.

The Lowinger Plaintiffs have not stated what they would add or change in an amended complaint. They posit that they could pursue a section 220 books and records action if they must plead with greater particularity. But as we already have discussed, they should have taken that step when the district court allowed them leave to amend after dismissing their first complaint. See *King*, 12 A.3d at 1150. Their request for discovery in this case also falls flat. The district court stayed discovery pending adjudication of the Officers' first motion to dismiss. But once the district court granted that motion and gave the plaintiffs leave to amend, they never attempted to re-open discovery to support their amended complaint. We can only assume that the Lowinger Plaintiffs' decisions not to attempt a section 220 action or to move to re-open discovery were strategic, and so their attempts to take those steps now are unavailing.

Finally, as the district court noted, at the time it dismissed this case, the litigation had been pending for three years. This appeal has taken it into its fourth year. The district court did not abuse its discretion in finding that the Officers would be unduly prejudiced by allowing continued litigation under the circumstances.

***

We AFFIRM the judgment of the district court.

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov



**FINAL JUDGMENT**

May 9, 2019

Before:   DIANE P. WOOD, Chief Circuit Judge
DANIEL A. MANION, Circuit Judge
ILANA DIAMOND ROVNER, Circuit Judge

| No. 18-1863 | ROBERT LOWINGER, et al., Plaintiffs - Appellants<br><br>v.<br><br>DOUGLAS R. OBERHELMAN, et al., Defendants - Appellees |
|---|---|
| **Originating Case Information:** ||
| District Court No: 1:15-cv-01109-SLD-JEH<br>Central District of Illinois<br>District Judge Sara L. Darrow ||

The judgment of the District Court is **AFFIRMED**, with costs, in accordance with the decision of this court entered on this date.

form name: **c7_FinalJudgment**(form ID: **132**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

May 31, 2019

To:     Shig Yasunaga
        UNITED STATES DISTRICT COURT
        Central District of Illinois
        Peoria , IL 61602-0000

| No. 18-1863 | ROBERT LOWINGER, et al.,<br> Plaintiffs - Appellants<br><br>v.<br><br>DOUGLAS R. OBERHELMAN, et al.,<br> Defendants - Appellees |
|---|---|
| **Originating Case Information:** ||
| District Court No: 1:15-cv-01109-SLD-JEH<br>Central District of Illinois<br>District Judge Sara Darrow ||

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

RECORD ON APPEAL STATUS:          No record to be returned

**NOTE TO COUNSEL:**
If any physical and large documentary exhibits have been filed in the above-entitled cause, they are

to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

**Date:**                                                         **Received by:**

_____5/31/2019_____                         _____/s/ Kerin M Burns_____

form name: **c7_Mandate**(form ID: **135**)